**FAIRFAX HOSPITAL ASSOCIATION, INC., Plaintiff,**

v.

**F. David MATHEWS, Secretary of Health, Education and Welfare, Defendant.**

**Civ. A. No. 76–693–A.**

United States District Court, E. D. Virginia, Alexandria Division.

Feb. 18, 1977.

William E. Donnelly, III, McCandlish, Lillard, Bauknight, Church & Best, Fairfax, Va., for plaintiff.

George P. Williams, Asst. U. S. Atty., Alexandria, Va., for defendant.

## MEMORANDUM OPINION AND ORDER

ALBERT V. BRYAN, Jr., District Judge.

The plaintiff, successor in interest to Commonwealth Doctors Hospital (CDH), a private hospital corporation, is a provider[1] of medical care to the aged. 42 U.S.C. § 1395, *et seq.* Through hospital insurance funded out of social security taxes, it is entitled to federal reimbursement for "reasonable costs" of covered services rendered to the aged. Such reimbursement is carried out, commonly, by private organizations acting as fiscal intermediaries pursuant to contract with the Secretary of Health, Education and Welfare (the Secretary). 42 U.S.C. § 1395h. In this case the Blue Cross Association, Group Hospitalization, Inc., was the intermediary.

In order not to delay reimbursement payments until a final determination of the reasonable cost of the services, interim estimated payments are made to providers at least monthly, with subsequent adjustments for overpayments and underpayments. 42 U.S.C. § 1395g, § 1395x(v)(1)(a)(ii); 20 CFR §§ 405.402(b)(1), (2) and § 405.454. A final determination as to reimbursable costs is made after the close of the provider's fiscal

---

1. A provider of services is defined in 42 U.S.C. § 1395x(u).

year, based upon a "cost report" required to be filed by the provider. 20 CFR § 405.-406(b). The determination as to the amount of reimbursement is made by the intermediary, 20 CFR § 405.1803, with the right of the provider to request a hearing before the Provider Reimbursement Review Board (PRRB) where the amount in controversy is $10,000 or more. 42 U.S.C. § 1395oo(a); 20 CFR § 405.1835. Within sixty days after a PRRB decision, the Secretary, on his own motion, may reverse or modify that decision. 42 U.S.C. § 1395oo(f)(1). The district court is given jurisdiction to review a final decision of the PRRB or when the body's decision is reviewed by the Secretary, the latter's decision, *ibid.* The action is to be tried pursuant to the applicable provisions of the Administrative Procedure Act (APA), *ibid.,* 5 U.S.C. § 701 *et seq.*

In this case, the intermediary, on November 5, 1974, sent CDH a notice reflecting a disallowance of certain reimbursement of a portion of pharmacy payments because those payments had been made to a "related party supplier." [2] Specifically, reimbursement was decreased for the first eight months of 1973 by reducing the pharmacy costs of the provider, CDH, to the actual cost to the related party supplier, in this case Virginia Medical Supply, Inc. (the Pharmacy). For the last four months of 1973 the intermediary also decreased pharmacy costs by reducing the management fee paid to Gunther Kessler and Associates,

**2.** The regulations upon which the intermediary relied and around which focus the issues in this case read as follows:

20 CFR § 405.427. *Cost to related organizations.*

(a) *Principle.* Costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere.

(b) *Definitions*—(1) *Related to provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

(2) . . .

(3) *Control.* Control exists where an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

(c) *Application.* (1) Individuals and organizations associated with others for various reasons and by various means. Some deem it appropriate to do so to assure a steady flow of supplies or services, to reduce competition, to gain a tax advantage, to extend influence, and for other reasons. These goals may be accomplished by means of ownership or control, by financial assistance, by management, and other ways.

(2) Where the provider obtains items of services, facilities, or supplies from an organization, even though it is a separate legal entity, and the organization is owned or controlled by the owner(s) of the provider, in effect the items are obtained from itself. An example would be a corporation building a hospital or a nursing home and then leasing it to another corporation controlled by the owner. Therefore, reimbursable cost should include the costs for these items at the cost to the supplying organization. However, if the price in the open market for comparable services, facilities or supplies is lower than the cost to the supplier, the allowable cost to the provider shall not exceed the market price.

(d) *Exception.* An exception is provided to this general principle if the provider demonstrates by convincing evidence to the satisfaction of the fiscal intermediary (or, where the provider has not nominated a fiscal intermediary, the Social Security Administration), that the supplying organization is a bona fide separate organization; that a substantial part of its business activity of the type carried on with the provider is transacted with others than the provider and organizations related to the supplier by common ownership or control and there is an open, competitive market for the type of services, facilities, or supplies furnished by the organization; that services, facilities, or supplies are those which commonly are obtained by institutions such as the provider from other organizations and are not a basic element of patient care ordinarily furnished directly to patients by such institutions; and that the charge to the provider is in line with the charge for such services, facilities, or supplies in the open market and no more than the charge made under comparable circumstances to others by the organization for such services, facilities, or supplies. In such cases, the charge by the supplier to the provider for such services, facilities, or supplies shall be allowable as cost.

Inc. (the Associates) to the actual amount necessary to operate the pharmacy, plus reasonable compensation.

CDH appealed the intermediary's decision to the PRRB. On May 6, 1976, that body after a hearing concluded (with one member dissenting) that the payments to the pharmacy were not made to a related organization. The Commissioner of Social Security on behalf of the Secretary reviewed the PRRB's decision and on July 6, 1976 reversed that decision, ruling that the CDH was related through common "control" to the Pharmacy and to the Associates, to whom payments had been made; accordingly, he reinstated the reduction in reimbursement as determined by the intermediary. The decision of the Commissioner is the final decision of the Secretary.

This civil action followed; and since the issues presented are to be decided upon the administrative record, the case appropriately was presented to the Court on cross motions for summary judgment. Argument on the motions was heard on February 11, 1977.

At issue in this appeal are (1) whether there is support in the record for the Secretary's determination that CDH and the Pharmacy were so related by common control as to render them subject to the related organization principles prescribed by 20 CFR § 405.427; (2) whether the regulations, pursuant to which the Secretary determined that the reimbursable costs to be paid CDH as a provider should be reduced are valid as applied to CDH under the circumstances of this case; and (3) what scope and standard of review is applicable to the Secretary's final decision.

## SCOPE OF REVIEW

 The plaintiff argues that, since the issue of "control" is one of fact, the determination of the PRRB which heard the testimony, is not to be reversed by the Secretary unless the findings of PRRB are "clearly erroneous" as that term is used in F.R.Civ.P. 52(a). Candidly admitting that it can find no precedent for such a proposition, the plaintiff further argues that in any event the Court must consider and give weight to the findings of PRRB. The answer to both arguments is found in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). There the Supreme Court rejected the "clearly erroneous" argument, and concluded that the hearing examiner's findings were merely part of the record upon which a reviewing court is to make its determination as to the substantiality of the evidence supporting the decision under review. The Court recognized that where there was, as here, disagreement between the final decision maker and the observer of the witnesses, the evidence supporting a conclusion may be less substantial than when they agree. And this Court has borne that in mind when reviewing the record in this case. Nevertheless, "the 'substantial evidence' standard is not modified in any way when the Board and [the] examiner disagree." *Id.* at p. 496, 71 S.Ct. at p. 469. The fact that we are here dealing with a board rather than a hearing examiner, or that judicial review can be had directly from the decision of the PRRB, does not alter this conclusion. There is no indication that Congress, in providing for review by the Secretary of the decision of the PRRB, intended a "drastic departure" from usual administrative practice. Indeed the reference to the APA as the guide for the Court in its trial of the action indicates just the contrary.

## VALIDITY OF REGULATIONS

In contesting the validity of the regulation as applied to it, plaintiff stresses that the focus of the statutes enacted by Congress is to insure that the costs are reasonable in order to be reimbursable.[3] In addi-

---

**3.** 42 U.S.C. § 1395f(b)(1):

(b) The amount paid to any provider of services with respect to services for which payment may be made under this part shall, subject to

the provisions of section 1395e of this title, be—

(a) the lesser of (A) the reasonable cost of such services, as determined under section

tion, plaintiff urges that the regulations, 20 CFR § 405.427(a) *et seq.,* are inconsistent with Congressional intent because they automatically disallow reimbursement of payments by a provider to a related party even if the payments are reasonable; and that because the "exception" to such disallowance contained in 20 CFR § 405.427(d) is by its terms inapplicable to the services rendered by this supplier, the regulations amount to an irrebuttable presumption of unreasonableness without regard to the actual facts. Cited in support of the last contention is *South Boston Gen. Hosp. v. Blue Cross of Virginia,* 409 F.Supp. 1380 (W.D.Va.1976).

■ Contrary to the argument that the regulations are inconsistent with Congressional intent, the Court concludes that the regulations are in furtherance of the broad discretion given the Secretary to determine the costs actually incurred in the furnishing of health services.[4] As such they are valid. *Mourning v. Family Publications Service,* 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). The Court can think of nothing better than the regulations in question as a means to guard against double profits on those services, or "sweetheart" contracts with suppliers, and the resulting increase of costs for those services beyond what is reasonable. Where "control," an issue of fact, is established, and only where it is established, the proscription of the regulations merely denies a double profit to a firm which is, in effect, dealing with itself.

While the Court does not feel the exception [20 CFR § 405.427(d)] is necessary to save the regulations, (although it obviously confirms its validity) it clearly is intended to ameliorate the rigors of the regulations where circumstances are present indicating an obvious "arm's length" arrangement and where such circumstances support a finding of reasonableness. The fact that the plaintiff cannot bring itself within the terms of the exception does not convert the regulations into an irrebuttable presumption of unreasonableness of costs.

## EVIDENTIARY SUPPORTABILITY OF SECRETARY'S DECISION

The Court has reviewed the record before the PRRB, the decision of that body, and the decision of the Secretary.

Having found no evidence either of Kessler's possession of significant common ownership in the provider's stock as defined in 20 CFR § 405.427(b)(2) or of his control as defined in 20 CFR § 405.427(b)(3), the PRRB found that the provider and the Pharmacy company were not "related" parties.

In reversing the decision of the PRRB, the Secretary concluded that there was control. He stated that:

The evidence shows that Mr. Kessler was deeply involved with Commonwealth Doctors Hospital from the day he and Dr. Gazale originated the idea of building a hospital. Before the hospital began operating, he had served as chairman of the finance committee, licensed agent and coordinator for the sale of stock and a member of the Executive Committee. He was the corporate secretary on the first Board of Directors and was later elected vice president. He filled that post until August 8, 1968. He was a Director of the 14 member Board of Di-

---

1395x(v) of this title, or (B) the customary charges with respect to such services . . .

**4.** 42 U.S.C. § 1395x(v)(1)(A):

The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be necessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services.

　　　*　　*　　*　　*　　*　　*

Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services . . . .

rectors which included his lawyer. When the lease agreement between the hospital and the pharmacy was signed, he held 6.3% of the total outstanding shares of the Provider. Mr. Kessler remained on the Board of Directors until April 24, 1969.

To be this closely tied, and to remain unrelated, within the meaning of the Regulations, would be patently impossible. It is apparent from the testimony that Mr. Kessler had the favored position for obtaining the pharmacy lease. He testified that his proposed contract was examined by two other pharmacists, who then decided to bid for the lease on the new pharmacy. In effect then, his was the only bid provided by the hospital.

\* \* \* \* . \* \*

It is obvious that Mr. Kessler had the power directly, or indirectly, significantly, to influence or direct the actions of the institution; thus he and the Provider ·were related.

\* \* \* \* \* \*

At the time the management contract was entered into, the original leasing contract was still in effect and still had many years to run. The Provider was very anxious to acquire ownership of the pharmacy, so it is true that Mr. Kessler did have significant bargaining power. But to say that he did not have the power to influence or direct the actions or policies of the Provider is to ignore all the facts leading up to the management agreement. Mr. Kessler had a legally enforceable pharmacy contract that still had 13 years to run. He was in a position to reject any unfavorable proposal, thus influencing significantly the action or policies of the Provider. The Provider argued that Mr. Kessler's role at the hospital had changed over the years so that now he has no voice in its operation. However, since it is clear that the parties were related back in 1966, when the lease to operate the hospital pharmacy began, they continued to be related in the subsequent contract between them.

The original lease was clearly very lucrative. The hospital saved over $144,000 in pharmacy expenses in the very first year after it acquired the pharmacy from Mr. Kessler. That the Provider initiated action to break the original lease also shows what power to control and influence the pharmacy owner had that enabled him to obtain such a favorable contract for his own company. The Provider did not, however, take all possible actions to terminate the control of the pharmacy owner. Instead, it had the suit dismissed as part of the 1973 merger and management agreement which gave him 22% of the Provider's outstanding stock and the right to manage the pharmacy.

The decision rendered by the majority of the Board is contrary to the Regulations on related organizations. That the pharmacy owner was able to obtain for his own corporations such very lucrative contracts, so costly to the Provider, shows that he had the power, directly or indirectly, significantly to influence or direct the actions and policies of the Provider as contemplated by 20 CFR 405.427(b)(3). In view of his status as an originator of the plan to build the hospital and form the hospital corporation, his activities in organizing it, his stock ownership, and his corporate office, the new hospital was subject to the domination and control of the pharmacy owner. Clearly the hospital was to a significant extent associated with or affiliated with or was controlled by the pharmacy owner and his own corporations as defined in 20 CFR 405.-427(b)(1).

It is noted that as to Issue II, the Board found that the " . . . Intermediary did not produce compelling or conclusive evidence that the Pharmacy Owner did in fact exercise 'legal or effective control' over the Provider's actions or policies within the meaning of § 405.427(b)(3) of the Regulations." This Regulation does not in any way require exercise of legal or effective control. All that it requires is that there be the power to influence or direct. Where there is such "power", control must be found under this Regulation.

\* \* \* \* \* \*

Specifically the Secretary found:

1. The amount in controversy exceeds $10,000 exclusive of interest and costs.
2. Gunther K. Kessler was sole owner of the Virginia Medical Supply, Inc., (the Pharmacy Company) from its incorporation in 1960. He was also sole owner of Gunther K. Kessler and Associates, Inc.
3. The pharmacy owner was one of the originators of the plan to build Commonwealth Doctors Hospital.
4. During the planning and building stages of Commonwealth Doctors Hospital, the pharmacy owner acted as chairman of the Hospital Building Committee, unofficial chairman of the Finance Committee, licensed agent and coordinator for the sale of stock and a member of the Executive Committee.
5. The pharmacy owner was elected Secretary of the Provider's first Board of Directors and continued in that post until May 19, 1966.
6. The pharmacy owner served as vice president of Commonwealth Doctors Hospital from May 19, 1966 to August 8, 1968.
7. On February 8, 1966, the Pharmacy Company entered into a highly lucrative 20-year lease and agreement with the Provider giving the Pharmacy Company exclusive rights to in-hospital pharmaceutical sales.
8. On February 8, 1966, the pharmacy owner owned 6.3% of the outstanding shares of stock of the Provider, which was one of the largest blocks of shares held by any one person.
9. The Provider subsequently brought suit to terminate the lease but withdrew the suit instead of prosecuting it to completion.
10. On August 2, 1973, Virginia Medical Services, Inc., was acquired by Commonwealth Doctors Hospital. As part of the consideration, Gunther K. Kessler and Associates, Inc., received a management contract to manage the pharmacy for the Provider and 22% of the stock in the Provider.
11. The pharmacy costs claimed for reimbursement by the Provider were among the highest in the Provider's locality during the periods at issue.

\* \* \* \* \* \*

The testimony before the PRRB, although at times in conflict, amply supports the Secretary's findings. Indeed, reading the record as a whole it is difficult to see how the PRRB could reach a contrary conclusion.

The record reveals Kessler as instrumental in forming CDH. Even before it opened he had negotiated the lucrative 1966 agreement—clearly as a result of his influence and while he was still on friendly terms with Gazale. After his "falling out" with Gazale in 1968, Kessler was inactive in the corporation until the appearance of Hall in 1971. During this interim, however, his lucrative 20-year exclusive 1966 agreement was still in force. After the appearance of Hall things began to "look up" for Kessler. After the initial rejection in 1971 of the "buy-out" agreement, Hall and Kessler began acquiring more stock, Kessler at times in a name other than his own. Kessler was active in the election of the "coalition" board of directors in June of 1972 which put Hall on the board and made him president. After this, with his friend Hall effectively the sole negotiator for CDH, Kessler and Hall negotiated the 1973 merger agreement and management agreement, *on less favorable terms to CDH than the 1971 proposal* which had been rejected by the stockholders of CDH in 1971. It may well have been that Kessler could insist on the favorable terms of the 1973 agreements because of his superior economic advantage arising from the 1966 agreement which still had, at Kessler's option, 13 years to run. But that economic advantage had been gained by his influential position back in 1966. It is no answer for CDH to say that it saved money under the 1973 agreements as compared with the 1966 lease. Kessler as owner, since 1973, of 80,000 additional shares of CDH, shared in that savings.

Defining "substantial evidence" as meaning such relevant evidence as a rea-

sonable mind might accept as adequate to support a conclusion, *Consolidated Edison Co. v. National Labor Relations Board,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938), the Court has little difficulty in making a determination in this case. Based upon a review of the record as a whole, including the decision of PRRB, the Court finds substantial evidence that CDH was controlled significantly by Kessler, and through him by the Pharmacy and the Associates, within the meaning of 20 CFR § 405.427(b)(1). Not only did Kessler's control exist prior to and at the time of the execution of the 1966 lease, but also by means of the 1966 lease and other influential factors, his control continued up to the time of the execution of the 1973 agreement. Even if not dominant, Kessler clearly was significantly influential, in at least an indirect way, in the actions and policies of CDH.

Accordingly summary judgment is awarded the defendant;

And it is so ordered.