[No. B007929. Second Dist., Div. Five. May 23, 1985.]

EVERHEALTH FOUNDATION, INC., Plaintiff and Appellant, v.
DEPARTMENT OF HEALTH SERVICES, Defendant and Respondent.

710

COUNSEL

Memel, Jacobs, Pierno, Gersh & Ellsworth and Martin J. Schnitzer for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Thomas A. Warriner, Assistant Attorney General, Anne S. Pressman and Richard A. Spector, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**EAGLESON, J.**—Respondent Department of Health Services (DHS) disallowed appellant Everhealth Foundation's (Everhealth) claim for reimbursement under Medi-Cal for two types of costs: (1) payments to three medical equipment leasing companies, and (2) the cost of housing certain Everhealth employees. The superior court denied Everhealth's petition for a writ of mandate to vacate this decision. We affirm.

### FACTS

Everhealth Foundation, previously known as Whittier Hospital, was a not-for-profit participant in California's Medi-Cal program. In the late 1960's, Everhealth began expanding its facilities and updating its equipment. Due to a lack of credit worthiness, however, it was unable to obtain necessary financing from institutional lenders.

Three partnerships were formed at different times to help finance the on-going expansion program: (1) Colima Equipment Leasing Company (Colima), formed in 1968; (2) Whittier Leasing Company (Whittier), formed in 1972; and (3) Friendly Hills Leasing Company (Friendly Hills), formed in 1976. General partners in all three companies were affiliated with Everhealth as physicians, administrators, corporate members, or board of directors members. Each partner was required to make a capital contribution and provide a personal guarantee, which the partnerships used to secure bank loans. This money was used to buy medical equipment which was then leased to Everhealth.

Everhealth doctors, many of whom were partners in the three leasing companies, requested that the hospital obtain certain pieces of medical equipment. Everhealth then solicited three bids from other lessors and relayed the lowest bid to Colima, Whittier or Friendly Hills. One of the partnerships would have to match or beat this bid in order to receive the hospital's business. Due to low overhead and low profit margin, one of the partnerships was usually able to match the lowest outside bid.

Eventually the partnerships leased equipment to other organizations besides Everhealth. This outside business was worth approximately 25 percent of their combined total revenue.

During the same time period, Everhealth owned eight single-family residences. Six of these homes were on property adjacent to the hospital, and two were a few miles away. The houses were furnished to employees on 24-hour call to enable them to return quickly to the hospital when needed. The rental value of these homes was negotiated as part of the employees' compensation.

### ADMINISTRATIVE BACKGROUND

During the period in question, DHS reimbursed participating hospitals for the cost of medical care furnished to Medi-Cal patients. The amount of reimbursement was determined by applicable federal Medicare provisions (former Welf. & Inst. Code, § 14106).

Generally, payments for goods and services are reimbursable at the hospital's cost if the cost is "reasonable" and "related to [patient] care." (42 C.F.R. § 405.451(a) (1984).) However, if the hospital and its supplier are "related" by "common ownership or control," reimbursement is limited to the "cost to the related organization [the supplier]."[1] This limitation prevents related organizations from artificially raising the price to the hospital, thereby extracting a double profit from Medicare or Medi-Cal transactions. (*Homan & Crimen, Inc.* v. *Harris* (5th Cir. 1980) 626 F.2d 1201, 1208.)

Nonetheless, there is an exception to the "related organizations" rule. The hospital may recover its full cost if the "related" supplier: (1) is a bona fide separate organization; (2) conducts a substantial part of its business with entities unrelated to the hospital, and there is an open, competitive market for its goods or services; (3) provides goods or services which are ordinarily obtained by hospitals from other organizations, and which are not ordinarily furnished directly by hospitals to patients; and (4) charges the hospital what it would pay in the open market. (42 C.F.R. § 405.427(d).)

---

[1] 42 Code of Federal Regulations, section 405.427(a) provides: "Costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere."

Everhealth filed cost reports with DHS documenting its Medi-Cal costs for fiscal years 1974, 1975 and 1976. (Welf. & Inst. Code, § 14161.) It sought reimbursement for, among other things, payments to the three leasing companies, and the cost of housing certain employees.

DHS reviewed these reports as part of its regular audit program (Welf. & Inst. Code, § 14170), and concluded that the leasing and housing costs were not fully reimbursable. Specifically, rental costs were reduced to the actual cost of the equipment to the partnership lessors, on the grounds that they and Everhealth were "related" organizations. DHS also disallowed depreciation, interest, taxes, and insurance on the houses because these costs were purportedly unreasonable and unrelated to patient care.[2]

After unsuccessfully challenging these adjustments at informal DHS hearings, Everhealth obtained a full administrative hearing.[3] (Welf. & Inst. Code, § 14171.) In his "proposed decision," the hearing officer partially granted Everhealth's appeal. First, he upheld the reduction of lease payments to the lessor's cost. This finding was based on the fact that Everhealth physicians, as general partners in the leasing companies, indirectly influenced the lessor's policies. Second, he allowed reimbursement for the cost of housing all employees except the hospital administrator and assistant administrator. For these two employees, the hearing officer found that the housing costs were unreasonable and unrelated to patient care. He noted that administrators are not normally compensated for call time, and that there was no evidence concerning the rental value they received.

DHS's director subsequently adopted the hearing officer's decision.[4] (Welf. & Inst. Code, § 14171.)

---

[2]The record is unclear concerning the exact housing costs that were disallowed. The auditor for DHS testified that he disallowed "expenses, depreciation, and taxes." However, the hearing officer refers to these costs as "interest, taxes, and insurance." We will assume that all of these items were disallowed.

[3]The disallowances were upheld in separate informal hearings for each fiscal year. The three years were later consolidated for purposes of the formal hearing, held March 16 and 17, 1982.

[4]The director adopted the hearing officer's analysis and conclusions: "Partners in the leasing companies were either staff members or administrators of the provider [Everhealth]. The provider was unable to establish that any of the exceptions to the related organization principle should apply here, and therefore the auditors' reduction of the rental costs to the costs of the supplies to the lessors was sustained. . . . [¶] . . . The 'free' housing was provided in lieu of such on-call compensation and the Hearing Officer found that when characterized as such, it was a reasonable cost of providing patient care and therefore allowable. The cost of housing to the Associate Administrator and Administrator was not found to be reasonable under this criterion and the exception was allowed to stand with respect to them."

Everhealth then petitioned for a writ of mandate to vacate the director's decision and allow full reimbursement. (Code Civ. Proc., § 1094.5.) After hearing oral argument and admitting the administrative record into evidence, the superior court denied the petition.

## DISCUSSION

### A. *Standard of Review*

Everhealth contends that the "substantial evidence test" is not the appropriate standard of review. It claims that this appeal presents only questions of law to be decided independently of the trial court's decision. We disagree.

█ If the facts are in dispute and no fundamental vested right is involved, the appellate court reviews the entire record to determine if substantial evidence exists to support the administrative and trial court decisions. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 144, 149 [93 Cal.Rptr. 234, 481 P.2d 242].)

Here, the facts were in dispute concerning Everhealth's relation to the partnerships, and the necessity of housing the two administrators. Additionally, Everhealth does not argue, nor do we find, that this case involves a fundamental vested right. Thus, our task is to determine whether, in light of the entire record, there is substantial evidence to support the findings below.

### B. *Equipment Leasing Costs*

█ Everhealth initially contends that there is "no factual support" for the finding that it is related to the leasing companies by common control. It argues that the physician/partners did not influence the hospital's particular choice of lessor. The three partnerships, according to Everhealth, were selected through the hospital's bidding system.

█ "Control" is defined as "the power, directly or indirectly, significantly to influence or direct the actions or policies" of another organization. (42 C.F.R. § 405.427(b)(3).) Under this definition, control exists even where one entity merely has potential rather than actual influence over another. In *Medical Center of Independence* v. *Harris* (8th Cir. 1980) 628 F.2d 1113, a management firm placed its personnel in key positions at the hospital. Six of the firm's representatives sat on the hospital's fourteen-member board, two served as hospital officers, and one hospital administra-

tor became an employee of the firm. The Eighth Circuit held that this "potential influence" over the hospital constituted "control" under section 405.427. (*Id.*, at p. 1118.)

Similarly, the three leasing partnerships were created by people who were in a position to influence Everhealth's policies. The partnership agreements for Colima and Whittier specifically required the partners to be voting members, medical staff members or employees of the hospital. As brought out at the hearing, partners in all three companies were in fact key hospital personnel. Mr. Frisch, DHS's auditor, testified that from 1969 to 1976, "substantial similarities" existed between the list of general partners in the three companies and members of the hospital corporation. Many of these parties were also voting members on the hospital board of directors. For example, board members had a total partnership interest in Colima that ranged from approximately 25 to 55 percent throughout Colima's existence. The board also held a steady interest of approximately 20 percent in Whittier, and 37 percent in Friendly Hills. The remaining partners were Everhealth administrators and physicians.[5] The hospital leased various pieces of equipment upon the request of some of these doctors.

In practice, some partners who had been long associated with the hospital had substantial input into its leasing decisions. Mr. Taylor, for example, was simultaneously a partner in all three companies, a member of the board, and the hospital's administrator. As the administrator, he was personally in charge of approving equipment leases. Additionally, three doctors greatly influenced the type of equipment that the hospital would lease.[6] These physicians also served as managing partners of Colima or Whittier.[7] As such, they had power, along with other managing partners, to lease property on behalf of the partnership.

Favorable leasing contracts induced Everhealth to lease equipment from the partnerships. Usually Everhealth found the equipment it wanted and purchased it. One of the partnerships would then buy the equipment from Everhealth on a lease back arrangement. All three partnership agreements stated that the partnership's "primary purpose" was to "assist" Everhealth

---

[5]There was significant overlap among the different groups. At the time the partnership agreements were drafted, all active medical staff members were also voting members of the hospital corporation. Likewise, many of the board members were doctors and/or hospital administrators.

[6]According to Frisch, these doctors were Akins, Hanten and Springer.

[7]For three years, Dr. Springer was a managing partner of Whittier. Drs. Akins and Hanten served for several years as managing partners of Colima.

by leasing it equipment and other necessary items.[8] This goal was achieved by offering Everhealth leases it could not have obtained elsewhere. Specifically, Everhealth's leasing expert, Mr. Hefft, testified that the hospital would have been unable to obtain the same leases on the open market. As a nonprofit hospital with unacceptable collateral, Everhealth was not considered a good credit risk. Only through the personal guarantees of the partners was Everhealth able to secure the necessary financing. Also, since the companies had a low overhead and a lower-than-average profit margin, their charges were below market. Hefft testified that the leasing industry operated with an average 7-to-10 percent profit margin. Yet Whittier had an approximate 3 percent return rate, while Colima and Friendly Hills operated at an approximate 1 percent return rate. Thus, although it accepted outside bids, Everhealth had incentive to lease from the partnerships set up for that purpose.

■ Everhealth next argues that even if the related organizations rule applies, it is entitled to its lease payments under the exception found in section 405.427(d).[9] It contends that it has met all four of this section's requirements.

The second criterion requires the hospital to demonstrate "by convincing evidence" that "a substantial part" of the supplier's business is transacted with unrelated organizations. This requirement is satisfied if the goods or services are supplied primarily to the general public and only incidentally to the related hospital. In *Am. Med. Intern., Inc.* v. *Sec. of H. E. W.* (D.D.C. 1979) 466 F.Supp. 605, plaintiff hospitals sought reimbursement for respiratory services furnished by a wholly owned subsidiary. After its merger with plaintiffs, the subsidiary also began rendering services to unrelated hospitals. For the three years in question, the percentage of the subsidiary's revenue from unrelated hospitals was 52 percent, 64 percent, and 67 percent. The court held that this evidence did ". . . not demonstrate

---

[8]Friendly Hills' articles of partnership also referred to assisting "several hospitals." However, the only hospital named was Whittier (now known as Everhealth).

[9]Payments to a related supplier are reimbursable ". . . if the provider demonstrates by convincing evidence . . . that the supplying organization is a bona fide separate organization; that a substantial part of its business activity of the type carried on with the provider is transacted with others than the provider and organizations related to the supplier by common ownership or control and there is an open, competitive market for the type of services, facilities, or supplies furnished by the organization; that the services, facilities or supplies are those which commonly are obtained by institutions such as the provider from other organizations and are not a basic element of patient care ordinarily furnished directly to patients by such institutions; and that the charge to the provider is in line with the charge for such services, facilities, or supplies in the open market and no more than the charge made under comparable circumstances to others by the organization for such services, facilities, or supplies." (42 C.F.R. § 405.427(d) (1984).)

convincingly that [the subsidiary] conducted *substantially all* of its business activities with unrelated providers and only incidentally with providers owned by [plaintiffs]." (*Id.*, at p. 619; italics added.)

Everhealth transacted an even smaller percentage of its business with unrelated entities. The companies had gross revenues of over $4 million. More than $3 million worth of this business was transacted directly with Everhealth. Only the remaining $1 million, or 25 percent of Everhealth's business, was generated by what it calls "other entities." Moreover, some of these "other entities" were Everhealth doctors who were also partners in the three leasing companies. These physician/partners rented major pieces of equipment worth several thousand dollars. Everhealth has therefore not shown that "substantially all" of the partnerships' business was conducted with other entities.

■ Everhealth similarly has not satisfied the fourth criterion. The provider must show "by convincing evidence" that the "charge" set by its related supplier is "in line with the charge" for similar services in the open market.

In *American Medical,* plaintiff hospitals established that the subsidiary supplier charged related and unrelated hospitals comparable percentages of its total revenue. However, there was no evidence of the actual dollar amount charged by either the subsidiary or unrelated suppliers. The court concluded that "[a] comparison of percentages is not sufficient to establish that the '*charge* . . . for such services, facilities or supplies is in line with the *charge* for such services, facilities, or supplies in the open market . . .' 42 C.F.R. § 405.427(d) . . . . Without specific evidence indicating the comparability of charges per service or charges in the open market, plaintiffs have not demonstrated that the fourth criterion has been satisfied." (*Id.*, at p. 620; italics in original.)

Everhealth's evidence also lacks this required specificity. Everhealth's expert, Mr. Hefft, concluded that the three partnerships' prices were "below market."[10] He based this opinion on the fact that each company oper-

---

[10]All of Everhealth's evidence concerning leasing company charges is encompassed in the following testimony of its expert:

"Q. Now, with reference to Colima Leasing Company, do you have an opinion as to whether or not the charges that were made by Colima Leasing Company to Whittier Hospital were in line with charges from other—by other leasing companies who provide similar

---

ated at a percentage rate of return that was below the industry average. However, aside from these percentages and Hefft's bare conclusion con-

---

services?

"A. No, they were not.

"Q. They were not in line?

"A. No.

"Q. And in what respect were they not in line?

"A. They were below market.

"Q. And upon what do you base that opinion?

"A. During that period the normal leasing company would have to have a profit somewhere in the neighborhood of between 7 and 8 percent per annum in order to pay their various overheads in the leasing business. Colima Leasing was very low. It was 1.32 per annum for their return on the cost of equipment.

"Q. As compared to a normal return—

"A. Between 7 and 10.

" . . . . . . . . . . . . . . . . . . . .

"Q. If Colima—if Whittier Hospital had gone out into the open market instead of doing business—if Whittier Hospital had been dealing at arms length with a leasing company with which it had no connection, would it have been able to obtain the rates that were comparable to or lower than those that were charged by Colima?

"No.

"Q. Now, with reference to the leases that you examined for Whittier Leasing Company, were the charges made by Whittier Leasing Company to Whittier Hospital in line with the charges made by other leasing companies providing comparable services on the open market at that time?

"A. No.

"Q. In what respect were they out of line?

"A. They were low.

"Q. Would you explain your answer?

"A. Well, without maintenance agreements which is in the lease they were low. And with a lease agreement it really kind of puts them in a web, but Whittier again, going back to 7 and 10 percent that a leasing company needs to maintain their company and pay their employees and various things pertaining to running a leasing company, Whittier Leasing Company has a 3.38 return per year on the cost of equipment. That does not take into consideration the dollar paid for maintenance at all.

"Q. And the normal return would have been 7 to 10 percent?

"A. Yes.

"Q. And Whittier was charging 3½ percent?

"A. 3.38.

" . . . . . . . . . . . . . . . . . . . .

"Q. If Whittier Hospital had negotiated at arms length with a leasing company with which it had no connection, would it have been able to obtain rates or prices comparable to or lower than those charged by Whittier Leasing?

"A. No.

"Q. Now, you said you also examined the leases and documents relating to Friendly Hills Leasing Company?

"A. That's correct.

"Q. Do you have an opinion as to whether or not the charges made by Friendly Hills to Whittier Hospital were in line with the charges made by other leasing companies in the area providing some of the services?

"A. No, they were low.

"Q. Would you explain that answer?

"A. What Friendly Hills did, they set up a credit line with a bank and then they charged the various loan percentage over their interest rate to the bank. As an example, they were

cerning "below market" rates, there is no "specific evidence" of the actual price Everhealth paid. Likewise, there is no evidence concerning the dollar amount charged by other suppliers for the same equipment. Like the plaintiffs in *American Medical,* Everhealth has not established that the partnerships' charges mirrored the charges of other lessors. Low profits are not synonymous with low prices.[11]

Finally, Everhealth ignores the purpose of the exception: "[I]t clearly is intended to ameliorate the rigors of the regulations where circumstances are present indicating an obvious 'arm's length' arrangement . . . ." (*Fairfax Hospital Ass'n* v. *Mathews* (E.D.Va. 1977) 459 F.Supp. 429, 433.) As shown in the aforementioned testimony, Everhealth's own expert concluded that the leases were not the product of arm's-length bargaining. Thus, Everhealth has failed to show by convincing evidence that the requirements of section 405.427(d) have been met.

■ Everhealth next claims that it is entitled to the full amount charged by the leasing companies even if the related-organizations rule applies. Citing *Richlands Medical Ass'n* v. *Harris* (4th Cir. 1981) 651 F.2d 931, it reasons that the "cost to the related organization" permitted under the rule is the fair rental value of the equipment.

In *Richlands,* hospital owners leased the hospital to a medical partnership. One of the lessors subsequently became the hospital administrator. Several years later, this lessor/administrator requested a rent increase which the

---

under 1 percent per year for the cost of equipment.

"Q. You testified earlier that 7 to 10 percent would be normal, and they were below 1 percent?

"A. Yes.

"Q. If Whittier Hospital had dealt at arms length with a leasing company with which it had no connection would that leasing company['s] charges have been comparable to or lower than those charged by Friendly Hills?

"A. No."

[11]Everhealth argues that since the partnerships usually underbid other lessors, the partnership leases were therefore below market. The facts do not support this conclusion.

First, there is no evidence that the hospital regularly used the bidding system. Mr. Frischling, Everhealth's vice president and general counsel, testified that the hospital "preferred" to solicit three outside bids before selecting a leasing company. However, we do not know how often the partnerships actually competed with other lessors for Everhealth's business.

Second, while the hearing officer found that the hospital usually accepted the partnerships' bids, he did not find that their prices were below the average market price. Instead, he concluded that the partnerships operated at less than a 3 percent profit, whereas the industry average was 10 percent. As noted above, these percentages are not "specific evidence" of the price charged.

Finally, Mr. Clayton, managing partner of Colima and Whittier, testified that his staff helped choose the other companies from whom price quotes would be solicited. Thus, the bidding system was not necessarily impartial.

partnership approved. Medicare officials denied reimbursement for this increase on the grounds that the two entities were related by common control. Reimbursement was limited to the lessor's cost of ownership.

The Fourth Circuit agreed that the two organizations were "related," but refused to limit reimbursement to the lessor's cost. The court noted that the related organizations rule was intended, in part, to prevent collusion between entities related by common control. It concluded that there is no reason to limit reimbursement where the fair market value of the goods or services is apparent from the record: "[W]here there is control only by influence, and the record provides a basis for determining the price that would be fixed as a result of arms-length bargaining, we see no justification for limiting the amount of reimbursement to a figure substantially below that 'market' price. In the absence of a more compelling indication that Congress or the Secretary [of the Department of Health, Education, and Welfare] intended a contrary result, we see no warrant for construing the definition of 'cost to the related organization' to exclude amounts which that organization may have obtained from the provider through legitimate arms-length negotiations." (*Id.*, at p. 935.) The court held that, after adjusting for inflation, the rent fixed before the lessor became the hospital administrator was the proper measure of reimbursement.

A similar result is unwarranted in the instant case. Unlike the *Richlands* parties, the three companies were related to Everhealth from their inception; they were created by hospital personnel for the hospital's benefit. Consequently, the leasing charges were never bargained for at arm's-length. As decided by the DHS hearing officer, the proper measure of reimbursement is the cost of the equipment to the leasing companies.[12]

▪ Everhealth's final argument for reimbursement of lease payments is as follows: Since the charges were below market, and the three companies operated at a less-than-average profit margin, the hospital's leasing costs are presumptively reasonable and therefore reimbursable.

---

[12]As stated in his decision, the hearing officer did not need to determine this cost: "[T]he parties have stipulated to a profit elimination methodology in the event of a finding by the Hearing Officer of the existence of a related organization. . . . The stipulation . . . is hereby incorporated by reference and made part of this decision."

DHS now argues that this stipulation precludes Everhealth from seeking a different measure of reimbursement. We disagree. As noted in the hearing officer's decision, the use of the "profit elimination methodology" is conditional upon a finding that the parties are related organizations. The stipulation itself states that it is to be used only ". . . if it is *finally* determined that the three leasing companies are related organizations . . . ." (Italics added.) The present appeal is simply another step in reaching this final determination. Nonetheless, we agree with the hearing officer's finding that the parties are related organizations.

The sole authority cited to support this argument is *Northwest Hospital, Inc.* v. *Hospital Service Corp.* (7th Cir. 1982) 687 F.2d 985. There, the owners of a for-profit hospital formed a new corporation (buyer) to buy the hospital and transform it into a not-for-profit corporation. The bulk of the purchase price was financed through promissory notes payable to the former owners (sellers). The 4 percent interest rate on this loan was far below the then-prevailing market rate. Medicare officials determined that the buyer and seller were related organizations, and denied reimbursement for all interest paid under the contract. This decision was based on the blanket disallowance for all interest paid by a provider to a related organization, found in 42 Code of Federal Regulations, section 405.419(c).

Contrary to what Everhealth would have us believe, *Northwest* does not hold that all below market costs are presumptively reasonable. Rather, the Seventh Circuit's opinion focuses on the reimbursement of interest costs under section 405.419(c). The court noted that the blanket disallowance denied reimbursement for even reasonable costs. This result contradicted the terms of the Medicare statute, and was unjust to hospitals whose only source of financing was a "related" entity. In invalidating the disallowance and allowing buyer its interest costs, the court described the "critical difference" between section 405.419 and section 405.427: "Section 405.427 does not prohibit reimbursement for the reasonable costs of materials and services obtained from related-party suppliers; it merely establishes a rebuttable limitation on costs which will be deemed reasonable (and hence reimbursable)." (*Id.*, at pp. 993-994.) This limitation is "rebuttable" through the exception to the related organizations rule in section 405.427(d). As noted earlier, Everhealth could not establish that the exception applied.

C. *Housing Costs*

 Everhealth essentially argues that depreciation, interest, taxes, and insurance on houses furnished to the two administrators were reasonable costs related to patient care. It attacks the hearing officer's findings that: (1) there were no facts showing that the administrators' total compensation was reasonable; and (2) administrators are not normally compensated for stand-by time.[13]

---

[13]Part of Everhealth's argument is that the hearing officer wrongly placed the burden of proving reasonableness on Everhealth.

Yet this conclusion is not readily apparent from the hearing officer's decision, which states: "[N]o figures were put into evidence with respect to what the value of the compensation of the houses was as to the administrators." In any event, there was sufficient evidence from the testimony of Mr. Frisch and Ms. Nelson, *infra,* to support the hearing officer's finding that these costs were not related to patient care.

■ Reimbursable costs must be both reasonable and related to patient care. (42 C.F.R. § 405.451(a) (1984).) Reasonable costs include those that are substantially in line with costs of similar institutions in the same area. (C.C.H., Medicare and Medicaid Guide at par. 5858 (1984).) ■ Costs are related to patient care if they are "common and accepted occurrences in the field of the provider's activity." (*Id.,* at par. 5862.)

■ Substantial evidence indicated that "free" housing for administrators was not a common form of compensation in the hospital industry. At various times, some of the houses located next to the hospital were occupied by an emergency room surgeon, the director of respiratory therapy, the supervisor of the dialysis unit, and the operating room supervisor. Two of these houses were also furnished to the director of management services (who was in charge of security) and the maintenance supervisor. All of these individuals were on 24-hour call.

Everhealth similarly provided a nearby house to Mr. Turner, the associate administrator of the hospital. He was on call to respond to patient consent, credit, and transfer problems. Mr. Taylor, the administrator, was also given a house, but his was located three to four miles from the hospital. He was on call to perform such duties as budgeting, reporting to the board, and approving lease contracts.

Mr. Frisch, DHS's auditor, gave expert testimony on the reimbursement of housing costs in the hospital industry. He testified that, in general, the practice of providing private residences to employees is not common in the hospital industry. In fact, in his ten years as an auditor, five of which he spent auditing hospital cost reports, Frisch had never encountered another hospital that claimed reimbursement for this type of cost. His supervisor likewise was not aware of any hospital that claimed the cost of private residences in its cost reports.

Ms. Nelson, who had been the hospital's associate administrator for 13 years, testified that nearby housing was more important for some employees than others. She believed that it was "critical" for the director of management services to be able to respond quickly to security problems. Also, the maintenance supervisor had to watch for equipment breakdown with "constant vigilance." Nelson further testified that all of the medical staff members who lived nearby needed to respond quickly to patient "emergencies." In contrast, it was not "critical" to have the associate administrator live nearby to respond to problems patients had in understanding consent forms. Nelson did not consider that kind of administrative problem to be an "emergency."

Together, the testimony of these two witnesses defeats Everhealth's argument that "the hospital would cease to operate" without the around-the-clock services of the administrators. The hearing officer correctly upheld the disallowance of housing costs for these two employees as these costs were not reasonably related to patient care.

## DISPOSITION

The judgment denying the petition for a writ of mandate is affirmed.

Feinerman, P. J., and Ashby, J., concurred.